IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN KEATING, | ) | |
| | ) | |
| Plaintiff, | ) | No. 17-cv-4018 |
| | ) | |
| v. | ) | Magistrate Judge Sidney I. Schenkier |
| | ) | |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1] | ) ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff, John Keating ("Mr. Keating"), has filed a motion for summary judgment and brief in support seeking reversal or remand of the final decision of the Commissioner of Social Security ("Commissioner") denying Mr. Keating's application for Disability Insurance Benefits ("DIB") (doc. #11: Pl.'s Mot. For Summ. J.; doc. #12: Pl.'s Opening Br.). The Commissioner has filed a cross-motion for summary judgment and a memorandum in support of affirming the ALJ's decision (doc. # 16: Comm'rs Mot. For Summ. J.; doc. #17: Def.'s Mem. in Supp. of Mot. Summ. J.). Mr. Keating also filed a reply brief (doc. #18: Pl.'s Reply Br.). For the reasons set forth below, we grant Mr. Keating's motion for summary judgment and deny the Commissioner's motion to affirm.

I.

Mr. Keating filed his application for DIB on January 28, 2013, alleging he became disabled on December 26, 2011 (R. 75, 197-98). After his claim was denied initially and upon

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Acting Commissioner of Social Security Nancy A. Berryhill as the named defendant.

[2] On August 1, 2017, by consent of the parties and pursuant to 28 U.S.C § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of the final judgment (doc #8).

reconsideration, Mr. Keating received a hearing from an Administrative Law Judge ("ALJ") on August 24, 2015 (R. 42, 83, 96). On November 24, 2015, the ALJ issued his decision finding Mr. Keating was not disabled from December 26, 2011 through the date of his decision (R. 22-35). The Appeals Council affirmed the decision, making it the final opinion of the Commissioner (R. 1). *See* 20 C.F.R. § 404.981. *Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016).

## II.

Mr. Keating was born on July 9, 1985 and he is 33 years old today (R. 45). He has a high school degree and also completed an apprenticeship through the Carpenters' Union (R. 46, 54). Mr. Keating worked as a carpenter until he was laid off sometime in 2011 (R. 46). On December 26, 2011, Mr. Keating was involved in an accident wherein his car collided with a semi-truck at an intersection and he was taken by paramedics to Advocate South Suburban Hospital to assess his injuries (R. 283). Mr. Keating underwent X-rays for his knee and cervical spine (R. 283-86).[3] While the knee X-ray was normal, the X-ray of Mr. Keating's cervical spine indicated reversal of normal cervical lordosis likely due to muscle spasm or Mr. Keating's positioning (R. 283-86).[4]

Mr. Keating began treatment at the Illinois Bone and Joint Institute in January 2012 (R. 365). Daniel Newman, M.D. ("Dr. Newman"), stated that Mr. Keating had sustained a hyperextension/flexion injury to his cervical spine; Dr. Newman was concerned about injury to the right rotator cuff or labrum (R. 367).[5] On March 2, 2012, Mr. Keating underwent his first

---

[3] *See* American Association of Neurological Surgeons, http://www.aans.org/Patients/Neurosurgical-Conditions-and-Treatments/Cervical-Spine (last visited August 23, 2018) (explaining that cervical spine is the neck region of the body).

[4] *See* The Colorado Physical Therapy Network, *Treating Patients with Cervical Lordosis*, COLORADO PHYSICAL THERAPY NETWORK BLOG (May 1, 2017), https://coloradophysicaltherapynetwork.com/2017/05/ (last visited August 23, 2018) (explaining that loss of cervical lordosis is also referred to as reversal of normal cervical lordosis and this diagnosis indicates that there is an evident abnormal straightening and/or bow in the opposite direction to that which is considered to be the norm).

[5] WebMD, https://www.webmd.com/pain-management/neck-injuries#1 (last visited August 23, 2018) (explaining that hyperextension occurs when the neck is flung backward past its normal limits).

2

shoulder surgery for debridement of the posterior labrum, acromioplasty, and mini open rotator cuff repair (R. 396).[6] Mr. Keating's condition improved with the physical therapy he received from May through July 2012 (R. 354-56, 358). However, Mr. Keating reported a flare up in his pain in August 2012 and Dr. Newman referred Mr. Keating to a spinal surgeon (R. 351-53).

On October 15, 2012, Mr. Keating met with Theodore Fisher, M.D., M.S. ("Dr. Fisher"), an orthopedic surgeon (R. 349-50), who in a follow-up appointment on November 12, 2012, recommended a C5-6 Anterior Cervical Discectomy and Fusion procedure ("ACDF") (R. 324-25).[7] Dr. Newman evaluated Mr. Keating again in late November 2012 and found that his range of motion was limited and there was some obvious weakness about his shoulder girdle (R. 344). Mr. Keating underwent the C5-6 ACDF procedure on February 19, 2013 (R. 313). After that surgery, Dr. Fisher instructed Mr. Keating to lift no more than five pounds and to continue his weight loss program (R. 319-20). Mr. Keating was sent to physical therapy again in May 2013 (R. 448).

In April 2013, Mr. Keating was referred to M.S. Patil, M.D. ("Dr. Patil") for an internal medicine consultative examination (R. 421). On a scale of one to ten with ten being the highest level of pain, Mr. Keating rated his pain at a nine out of ten level (R. 421). Mr. Keating stated he could not lift more than five pounds, bend and pick up anything heavy, and stand or walk for more

---

[6] *See* Kevin James, *Labral Debridement Surgery to Correct Shoulder Issues*, SPINE & ORTHOPEDICS BLOG (Sept. 14, 2017), http://www.asodocs.com/general/labral-debridement-surgery-to-correct-shoulder-issues/ (clarifying that a debridement surgery is needed if one's labral tear does not heal sufficiently with conservative treatment and surgery may be required to address issues like repairing or removing the torn tissue); *see also* Orthopaedic Surgery Doctor Philippe Paillard, https://www.orthopaedic-surgery-paris.com/shoulder-acromioplasty/ (last visited August 23, 2018) (explaining that a subacromial shoulder impingement is excessive and recurrent contact between the tendons and the acromion, which causes inflammation of the tendons and can result in rupture and an acromioplasty therefore aims to remove the impingement by increasing the sliding space for the shoulder tendons); *see also* WebMD, https://www.webmd.com/fitness-exercise/ruptured-tendon#4-7 (last visited August 23, 2018) (describing a rotator cuff repair as the process of removing dead tissue without actually cutting the joint open).

[7] Mayfield Brain & Spine, http://www.mayfieldclinic.com/PE-ACDF.htm (last visited August 23, 2018) (describing an anterior cervical discectomy and fusion as a surgery to remove a herniated or degenerative disc in the neck).

than five minutes (R. 421). Dr. Patil found that Mr. Keating was extremely obese with a BMI of 44 (R. 424). He also found that Mr. Keating had less than full range of motion in his cervical spine, lumbar spine, and right shoulder (R. 423). Dr. Patil reported that Mr. Keating had normal gait, speech, hand dexterity, memory and mental activity (R. 424).

Lenore Gonzalez, M.D. ("Dr. Gonzalez") completed a Disability Determination Explanation at the Initial Level of Mr. Keating on April 26, 2013 finding him not disabled (R. 75-83). Dr. Gonzalez found that Mr. Keating could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds (R. 79-80). She also opined that Mr. Keating could stand, walk, or sit for a total of six hours and that he was limited in his right overhead reach (R. 80). She found that Mr. Keating did not have any visual, communicative or environmental limitations (R. 80).

Charles Wabner, M.D. ("Dr. Wabner") completed a Disability Determination Explanation at the Reconsideration Level of Mr. Keating in October 2013 finding him not disabled (R. 86-97). Dr. Wabner found that Mr. Keating could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds (R. 93). He also opined that Mr. Keating could stand, walk, or sit for a total of six hours and he was limited in his right overhead reach (R. 93-94). Dr. Wabner further found that Mr. Keating was limited in climbing, stooping, kneeling, crouching, and crawling (R. 94). He found that Mr. Keating did not have any visual, communicative or environmental limitations (R. 95).

In December 2013, Mr. Keating, on referral from Dr. Fisher, underwent a Magnetic Resonance Imaging ("MRI") of his shoulder and Computed Tomography ("CT") of his cervical spine to evaluate Mr. Keating's back and shoulder pain (R. 478, 627, 630). The CT of his cervical spine did not show any stenosis or evidence of acute skeletal abnormality, but the MRI showed a

4

broad deep surface partial thickness tear of most of the supraspinatus tendon (R. 627, 630). Mr. Keating met with Dr. Fisher in January 2014 and complained of headaches, shoulder pain, and mid-thoracic back pain (R. 625).

Dr. Fisher sent Mr. Keating for a functional capacity evaluation on January 20, 2014 where Khaled Rashad, PT, DPT, OCS, CES ("Mr. Rashad"), a physical therapist, found that Mr. Keating could only assume a position in the light category which restricts lifting to 20 pounds and carrying to 10 pounds (R. 626, 681). Mr. Rashad noted that Mr. Keating could not perform any balancing activities that require crouching, reaching with the right arm, stooping, kneeling, or crawling (R. 681).

Dr. Fisher reevaluated Mr. Keating on March 3, 2014 (R. 623). Dr. Fisher found that Mr. Keating was at maximum medical improvement for his back and neck (R. 624). He also set permanent restrictions of lifting to no more than 20 pounds and no repetitive lifting, bending, or twisting (R. 624).

Mr. Keating met with Anas Alzoobi, M.D. ("Dr. Alzoobi") in September 2014, on referral from Dr. Newman, for chronic pain management of the neck, shoulder, and lower back (R. 651). Mr. Keating's previous pain doctor had prescribed him Norco and Gapapentin which he was still taking when he met with Dr. Alzoobi (R. 651).[8] Dr. Alzoobi remarked that Mr. Keating was "somewhat distracted," "incoordinated" and a poor historian while describing his symptoms and medical history (R. 651). Additionally, Mr. Keating's score of more than 18/28 on an adult depression screening form represented "significant or major depressive disorder" or "possible adjustment disorder" (R. 632, 651-52). Dr. Alzoobi recommended an epidural steroid injection for Mr. Keating's back pain and referred Mr. Keating for a psychiatric evaluation (R. 652).

---

[8] Mr. Keating did not identify his previous pain doctor and did not recall when he began his previous pain medication.

In October 2014, Mr. Keating underwent a right shoulder arthroscopy with debridement, synovectomy, and subacromial decompression (R. 596).[9] While at the hospital, he presented with anxiety, depression, memory loss, and bilateral arm/hand weakness (R. 598). Thereafter, Mr. Keating continued his physical therapy (R. 714) and Dr. Alzoobi began administering cervical epidural steroid injections for Mr. Keating's back pain in October 2014 (R. 663, 707). Dr. Alzoobi initially prescribed Mr. Keating Celebrex and Norco for his back pain, and later changed the prescriptions to Norco, Cymbalta, and Gapapentin (R. 722, 724).

Mr. Keating was examined by psychiatrist, Joseph Beck, MD ("Dr. Beck") on May 27, 2015 for an initial evaluation (R. 716). Dr. Beck wrote in the "History of Present Illness" section of his analysis that "Mr. Keating is developed a major depressive disorder versus a pain disorder as a result of his continued pain" (*Id.*). Dr. Beck continued in this section that Mr. Keating has a "pronounced concentration disturbance, dysphoria, anhedonia, hopelessness, helplessness and the recent development of panic attacks" (*Id.*). Dr. Beck explained that Mr. Keating's medications, Norco and Gabapentin, are possible "culprits of the concentration disturbance;" however, upon tracking Mr. Keating's "entire symptom cluster" concentration and memory remain a problem, Dr. Beck would consider neuropsychiatric "as he may have had a TBI (traumatic brain injury) at the time of the accident" (*Id.*).

In other sections of his evaluation, Dr. Beck described Mr. Keating's appearance as "unconfident," his attention span and concentration as "within normal limits," his mood as "depressed" and his affect as "appropriate to thought" (R. 716). He also noted that Mr. Keating

---

[9] *See* Manhattan Orthopedic Care, https://www.mocnyc.com/shoulder-arthritis-debridement/ (last visited August 23, 2018) (explaining that this shoulder surgery is used to remove tissue in the shoulder joint that has been damaged from arthritis, overuse, or injury); *see also* WebMD, https://www.webmd.com/rheumatoid-arthritis/do-i-need-surgery-for-rheumatoid-arthritis#2 (last visited August 23, 2018) (explaining that a synovectomy is where doctors remove the lining or synovium of a joint so it does not damage one's cartilage and bone); *see also* Bupa, https://www.bupa.co.uk/health-information/directory/s/subacromial-decompression (last visited August 23, 2018) (explaining that a subacromial decompression is an operation on the shoulder done to treat shoulder impingement).

was articulate and coherent with a normal thought rate and thought process and that he was able to abstract (*Id.*). Mr. Keating reported to Dr. Beck that he worries a lot, experiences feelings of restlessness, has pleasurable activity disinterest, poor concentration, memory impairment and a depressed mood that causes him to frequently cry (R. 717). Mr. Keating also responded in the affirmative to both depression screen questions (*Id.*). Dr. Beck diagnosed Mr. Keating with depressive psychosis-mod for which he prescribed Cymbalta and a follow up appointment in one month (R. 716-17).

At his follow up appointment with Dr. Beck on June 23, 2015, Mr. Keating reported low energy, pleasurable activity disinterest, memory impairment and a depressed mood with frequent crying (R. 719). Mr. Keating's chief complaint was anxiety (*Id.*). Dr. Beck's diagnosis of depressive psychosis-mod remained unchanged, and he increased Mr. Keating's Cymbalta dosage (R. 720).

On September 8, 2015, psychiatrist, Mark A. Amdur, M.D. ("Dr. Amdur"), examined Mr. Keating at the request of his attorney (R. 725). After examining Mr. Keating, Dr. Amdur wrote a psychiatric evaluation letter describing Mr. Keating's mental health issues and diagnosis (*Id.*). Mr. Keating reported to Dr. Amdur that he cannot concentrate, had trouble remembering things, was constantly in pain, woke up with headaches, has back spasms, gets nerve pains in his legs, cannot maintain attention and is always staring off at things (*Id.*).

Mr. Keating described his functional limitations related to concentration and memory problems to Dr. Amdur as unable to maintain attention while reading, unable to complete forms or follow conversations, needing things repeated to him and always losing things (R. 726). Mr. Keating stated he initially became depressed in 2009 when his brother passed away and began to emerge from that depression when he had his car accident in 2011 (*Id.*). He explained that he has

7

some paranoia about how others perceive him and counting compulsions, particularly regarding his medications (*Id.*).

Mr. Keating stated to Dr. Amdur that he cannot concentrate on television or reading and does not go to taverns, movies or church (R. 728). He also reported that he gets out of his house two to three times a week; he would go grocery shopping every so often with a friend but was nervous about going on his own due to his "back spasms" (*Id.*). Dr. Amdur maintained that there was a component of "panic" in Mr. Keating's report of "back spasms" (*Id.*).

Dr. Amdur described Mr. Keating as "cooperative," "markedly depressed" and marked somatic and pain preoccupations (R. 728). Dr. Amdur noted that Mr. Keating independently reported panic symptoms, and behaviors consistent with panic and agoraphobia (*Id.*). The Montreal Cognitive Assessment ("MoCA") was administered to Mr. Keating and he attained a score of 12 out of 30 (*Id.*).[10] Dr. Amdur opined that "there is very significant cognitive impairment here" (*Id.*)

Dr. Amdur found that Mr. Keating's perceived pain restrictions were both cognitive and somatic (R. 728). Dr. Amdur stated that Mr. Keating's limitation in travel is very similar to the limitation described by classic panic disorder with agoraphobia (anxiety disorder) (*Id.*). Dr. Amdur opined that Mr. Keating's history was highly consistent with post-concussion syndrome because he had headaches, impaired concentration and attention, and very poor performance on the MoCA (R. 729). Dr. Amdur stated that Mr. Keating was unable to travel independently to work, he would be distracted by pain or concentration impairments, he was unable to tolerate work stresses and his memory impairments would interfere with his ability to follow simple instructions (*Id.*). Finally,

---

[10] U.S. Department of Veterans Affairs, https://www.parkinsons.va.gov/consortium/moca.asp (last visited August 23, 2018) (explaining that the MoCA exam is a rapid screening instrument for mild cognitive dysfunction which assesses different cognitive domains: attention and concentration, executive functions, memory, language, visuoconstructional skills, conceptual thinking, calculations, and orientation; the total possible score is 30 points and a score of 26 or above is considered normal).

Dr. Amdur stated that Mr. Keating was "markedly depressed with prominent expressions of hopelessness" (*Id.*). Dr. Amdur then diagnosed Mr. Keating with major depression, cognitive disorder and panic with agoraphobia (*Id.*).

### III.

On August 24, 2015, at the hearing before the ALJ, Mr. Keating testified that he is currently living with his father and he has not worked since he was laid off sometime in 2011 (R. 45-46). Mr. Keating testified that his shoulder condition had improved since receiving surgery after his accident (R. 47-48). However, Mr. Keating also described how he still consistently deals with shooting pains in his back and neck, headaches, and back spasms throughout the course of the day (R. 48-50). He noted that the most he could lift was about 10 pounds (R. 48). He testified that he cannot sleep through the night due to his back spasms and headaches (R. 54). Mr. Keating also explained that his hands often go numb (R. 49). He further testified that he could only stand comfortably for 30 minutes at a time and could only sit for about 45 minutes to an hour before he started experiencing back spasms (R. 52-53). Mr. Keating stated that he was experiencing side effects of his depression medication which included feeling out of place in social situations, but he had not felt any significant side effects from his pain medication besides some drowsiness (R. 53-54, 59).

Mr. Keating explained that his daily routine included some light exercise, making his own sandwiches and salads, and watching television (R. 54-55). Mr. Keating noted that he did not often participate in any social or recreational activities and he could only help with minimal household chores such as washing the dishes (R. 55-56). He testified that he does go grocery shopping, but he prefers to bring someone along with him and he does not lift more than a gallon of milk and a plastic bagful of groceries (R. 52). When Mr. Keating was asked about his depression he described

his feelings as not liking "life because I can't work. I can't do anything. I feel like a bum" (R. 59). He also stated that he did not like life because he was in pain everyday (*Id.*).

A vocational expert ("VE") testified next (R. 60). The ALJ gave the VE a hypothetical of a person with the same age, education and work experience as Mr. Keating who is (a) limited to light work, (b) limited to no more than frequent climbing of ramps and stairs, (c) no more than frequent stooping, kneeling, crouching and crawling and (d) no more than frequent overhead reaching with the right upper extremity (R. 61). The VE testified that the individual would not be able to perform any of Mr. Keating's past work, but that light, unskilled work would be available, and she gave examples such as office helper and storage facility clerk (*Id.*). The ALJ then added to the hypothetical that the individual was limited to sedentary work and the VE provided examples of three sedentary jobs that could be performed: document preparer, addresser or telephone quotation clerk (R. 62). The VE also testified that the off-task tolerance for the light and sedentary jobs is 15 percent, and if the individual had to lie down during the day, it would preclude work altogether (R. 62, 65).

Next, rare contact with the public, supervisors and coworkers was added to the hypothetical and the VE testified that this additional limitation would eliminate all the positions at both the sedentary and light levels (R. 65-66). When the hypothetical was changed to occasional contact, that ruled out two of the jobs, but four remained (R. 66). Additionally, if the individual had problems with attention and concentration up to a third of the day, the VE stated that it would eliminate all of the jobs (R. 67).

### IV.

On November 24, 2015, the ALJ issued a written decision concluding that Mr. Keating was not disabled from his alleged onset date of December 26, 2011 through the date of the decision (R.

22, 35). At Step One, the ALJ determined that Mr. Keating has not engaged in substantial gainful activity ("SGA") (R. 24).

At Step Two, the ALJ determined Mr. Keating had the severe impairments of obesity, cervical degenerative joint disease (DJD), thoracic degenerative joint disease (DJD), right shoulder rotator cuff tear and degenerative joint disease (DJD) (R. 24). However, the ALJ determined that Mr. Keating's history of hernia repair, knee and ankle pain and mental impairment of major depressive disorder/adjustment disorder were not severe (R. 25).

The ALJ determined that Mr. Keating's mental impairment of major depressive/adjustment disorder was not severe because it did not cause more than minimal limitation in his ability to perform basic mental work activities (R. 25). In making this finding, the ALJ considered the four broad functional areas set out in the disability regulations for evaluating mental disorders known as the Paragraph B criteria and in section 12.00C of the Listing of Impairments (*Id.*). The ALJ found that Mr. Keating had no limitations in activities of daily living, mild limitations in social functioning and in concentration, persistence or pace, and no episodes of decompensation (R. 25-26).[11]

The ALJ noted that Mr. Keating's limitations in activities of daily living were due to his physical impairments rather than his depression (R. 25). The ALJ also found that although Mr. Keating does not go to taverns, bars, or church, he has only a mild limitation in social functioning because he has no difficulty in getting along with others and is able to go shopping occasionally (*Id.*). The ALJ also mentioned that Mr. Keating was described as "cooperative" in Dr. Amdur's report (*Id.*).

---

[11] The ALJ first stated that Mr. Keating had "no" limitation in social functioning, then later stated he had "mild" limitation (R. 25).

With respect to concentration, persistence or pace, the ALJ again found that Mr. Keating's limitations in these areas were mild (R. 26). The ALJ recognized Mr. Keating's score of 12 out of 30 on the MoCA performed by Dr. Amdur indicated a "significant cognitive impairment," but the ALJ also stated that Mr. Keating's attention was focused during the examination and that he understood the questions (*Id.*). The ALJ continued that Mr. Keating reported that his pain was the reason he loses concentration rather than his depression; and he reported he reads and watches television, which are activities that involve concentration (*Id.*). The ALJ also relied on Mr. Keating's "intact memory" at the consultative examination in April 2013 by Dr. Patil and normal attention and concentration at an appointment in May 2015 (*Id.*). Finally, Mr. Keating experienced no episodes of decompensation which were of extended duration (*Id.*).

In determining that Mr. Keating did not have a severe major depressive disorder/adjustment disorder, the ALJ gave little weight to Dr. Amdur's opinion (R. 26). The ALJ explained that Dr. Amdur was not Mr. Keating's treating physician, and that Mr. Keating only underwent this examination at the behest of his attorney (*Id.*). In addition, the ALJ found that Dr. Amdur's opinion was inconsistent with the evidence in the record because (1) Mr. Keating only recently began seeking treatment for his depression and it was limited to only two treatment notes from May and June 2015, (2) Mr. Keating had an intact memory and normal attention and concentration at the consultative examination in April 2013, and (3) Mr. Keating had normal attention and concentration at the May 2015 appointment (R. 26-27).

At Step Three, the ALJ determined that Mr. Keating did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (R. 27). The ALJ found that Mr. Keating's right shoulder rotator cuff and DJD did not meet Listing 1.02 because there was no evidence that

he had an inability to perform fine and gross movements effectively (*Id.*). Additionally, the ALJ found that Mr. Keating's cervical and thoracic DJD did not meet Listing 1.04 because there was no evidence of nerve root compression, spinal arachnoidoitis, or an inability to ambulate effectively (*Id.*). Finally, the ALJ found that Mr. Keating's obesity did not contribute to his symptoms or increase the severity of his other physical impairments (*Id.*).

The ALJ then determined Mr. Keating's residual functional capacity ("RFC") (R. 28). The ALJ found that Mr. Keating has the RFC to perform light work as defined in 20 CFR 404.1567(b) except that he is limited to no more than frequent climbing of ramps and stairs, as well as frequent stooping, kneeling, crouching, crawling, and overhead reaching with the right upper extremity (*Id.*). The ALJ determined that Mr. Keating's medically determinable impairments could reasonably be expected to cause some of his alleged symptoms including numbness, migraines, and shooting pain (*Id.*). However, the ALJ found that Mr. Keating's statements regarding the intensity, persistence and limiting effects of these symptoms were not entirely credible (*Id.*). Mr. Keating reported he was laid off for reasons other than his impairments (*Id.*). Additionally, the record reflects that Mr. Keating could cook, do laundry, drive a car, and go shopping (R. 29). The lack of any strength deficits was also contrary to Mr. Keating's allegations of pain (*Id.*). Moreover, the surgeries Mr. Keating underwent on his spine and shoulder appeared to have been relatively successful (R. 30-31).

The ALJ also considered the opinions of state agency medical consultants, Dr. Gonzalez and Dr. Wabner, who determined that Mr. Keating could perform light work (R. 31). They opined Mr. Keating could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, and had few other limitations (R. 80, 92). Based on the seven strength factors of the physical RFC (lifting/carrying, standing, walking, sitting, pushing and pulling), they determined that the

maximum sustained work capability for Mr. Keating was light work (R. 83, 96). The ALJ gave great weight to their opinions because they have knowledge of the Social Security Administration's Rules and Regulations and their opinions were consistent with the record (R. 31).

The ALJ considered the opinion of Mr. Keating's treating physician, Dr. Fisher, who permanently restricted Mr. Keating to lifting no more than 20 pounds and determined that Mr. Keating likely could not return to work (R. 31-32). The ALJ gave partial weight to his opinion because a finding that a claimant is unable to work or disabled is reserved for the Commissioner and Dr. Fisher's opinions seemed to be durational in nature (R. 32). The ALJ also considered the opinion of Dr. Newman, who determined that Mr. Keating would be unable to work and gave little weight to that opinion for the same reasons (R. 32). The ALJ gave great weight to the functional capacity evaluation performed by Mr. Rashad because the finding that Mr. Keating could perform light work was consistent with the record (R. 32). Based on the objective medical evidence and above-cited opinions, the ALJ found that Mr. Keating was limited to light work and unable to perform past relevant work (R. 33). Citing the testimony of the VE, the ALJ determined that there were jobs in the national economy that Mr. Keating could perform given his age, education, work experience and RFC (R. 34).

## V.

We review the ALJ's decision to determine if it was supported by "substantial evidence," which the Seventh Circuit has defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Alvarado v. Colvin*, 836 F.3d 744, 747 (7th Cir. 2016). "Although we will not reweigh the evidence or substitute our own judgment for that of the ALJ, we will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow us, as a reviewing court, to assess the validity of

the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

Mr. Keating argues that reversal and remand is warranted for four reasons: (1) that the ALJ erred in rejecting the opinion of Dr. Amdur and finding Mr. Keating's mental impairment to be non-severe, (2) that the ALJ erred in his assessment of Mr. Keating's credibility, (3) that the ALJ erred in failing to consider the line of evidence related to Mr. Keating's headaches and obesity and (4) that the ALJ erred in rejecting the opinions of Mr. Keating's treating doctors (Pl.'s Opening Br. at 8). We remand based on Plaintiff's first argument; we therefore do not address Plaintiff's other challenges to the ALJ's decision.

The ALJ gave little weight to Dr. Amdur's opinion because first, he was not Mr. Keating's treating physician and underwent the examination through his attorney's referral and second, his opinion was inconsistent with the evidence in the record (R. 26). We find that the ALJ failed to build a logical bridge to support either rationale.

Mr. Keating met with Dr. Amdur once, at the request of his attorney, post-hearing for a psychiatric evaluation. We agree with the ALJ, Mr. Keating and the Commissioner that Dr. Amdur was not Mr. Keating's treating physician. *See Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009) (defining a nontreating source as a "physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing relationship with you"). Thus, the ALJ was not required to give Dr. Amdur's opinion controlling weight. However, at the same time, the ALJ was not empowered to reject Dr. Amdur's opinion merely because he was not a treater, or because Mr. Keating underwent the examination through attorney referral. *See Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009) (holding that the ALJ erred in rejecting the opinion of a physician because the claimant was referred to him by her attorney and failed to address whether

the physician's medical opinions were supported by medically acceptable clinical and laboratory techniques). An ALJ must determine the weight a nontreating physician's opinion deserves by examining how well he or she supported and explained the opinion, whether the opinion is consistent with the record, whether the doctor is a specialist, and any other factor of which the ALJ is aware. *Simila*, 573 F.3d at 515.

The ALJ based his decision that Dr. Amdur's opinion was inconsistent with the record on Mr. Keating only recently seeking treatment for his depression and on the limited nature of the treatment (R. 26-27). Additionally, the ALJ noted that the claimant had an intact memory at his consultative examination with Dr. Patil in April 2013 and normal attention and concentration at "an appointment in May 2015" (R. 27). However, in his opinion, the ALJ never identified the psychiatrist (Dr. Beck) whom Mr. Keating visited in May and June 2015, and failed even to acknowledge that he specialized in psychiatry (R. 716). Nor did the ALJ mention, let alone offer any analysis of, the fact that Mr. Keating was prescribed Cymbalta (medication used to treat depression and anxiety) by Dr. Beck in May 2015 and that the dosage was increased in June 2015 (R. 717, 720). The ALJ did not address the fact that Dr. Beck's diagnosis of depressive psychosis-mod aligned with Dr. Amdur's observations during his September 2015 psychiatric evaluation that Mr. Keating worried about people talking about him behind his back and feeling like a burden (R. 716-17, 726). *See Gerstner v. Berryhill*, 879 F.3d 257, 262 (7th Cir. 2018) (describing how the ALJ considered only the signs of possible improvements in the psychiatrist's notes but ignored the negative findings). The ALJ did not explain why Dr. Beck's diagnosis of depressive psychosis-mod in May and June 2015 would be inconsistent with such statements (R. 717).[12]

---

[12] WebMD, https://www.webmd.com/depression/guide/psychotic-depression#1 (last visited August 23, 2018) (defining psychotic depression as a subtype of major depression that occurs when a severe depressive illness includes some form of psychosis, which may include hallucinations (such as hearing a voice telling you that you are no good

The ALJ ignored Dr. Beck's opinion that if Mr. Keating's concentration and memory remained a problem, he would consider neuropsychiatric because Mr. Keating might have had a traumatic brain injury at the time of his accident (R. 716). Similarly, the ALJ ignored Dr. Amdur's opinion that Mr. Keating's history was highly consistent with post-concussion syndrome (R. 729). The ALJ also did not discuss whether Dr. Beck was to be considered a treating source or how much weight, if any, should have been assigned to Dr. Beck's opinion.

Additionally, the ALJ did not consider Dr. Beck's statement that during his initial evaluation, Mr. Keating was reported as having a "pronounced concentration disturbance" (R. 716). The Commissioner argued that this evidence could be disregarded because it was part of Mr. Keating's self-reported medical history (and not a finding by Dr. Beck), and that Dr. Beck found Mr. Keating presented with normal concentration and attention span during the mental status assessment (doc. #17: Def.'s Mem. in Supp. of Mot. For Summ. J. at 5). However, all findings within a psychiatric note must be considered even if they were based on the patient's own account of his or her mental symptoms. *See Gerstner*, 879 F.3d at 262. Additionally, under the *Chenery* doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87–88, 63 S.Ct. 454, 87 L.Ed. 626 (1943); *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir.2012). In his opinion, the ALJ did not mention Mr. Keating's "pronounced concentration disturbance," let alone state whether it was self-reported or a finding by Dr. Beck.

The ALJ also further failed to consider that while Mr. Keating first began seeking treatment for his depression in May 2015, Mr. Keating's doctors noticed issues regarding his mental health at least by September 2014 (R. 632). *See Gerstner*, 879 F.3d at 262 (explaining that the ALJ erred

---

or worthless), delusions (such as intense feelings of worthlessness, failure, or having committed a sin), or some other break with reality).

in overlooking the fact that a physician's opinions were consistent with the diagnoses and opinions of other medical sources who also treated the claimant). The ALJ pointed out that Mr. Keating had only recently begun treatment for his depression, and that Mr. Keating had a normal mental status examination at the consultative examination performed in April 2013 by Dr. Patil (R. 26). But 18 months later, when Mr. Keating completed an adult depression screening form on September 12, 2014, at the request of Dr. Alzoobi, the results demonstrated significant or major depressive disorder (R. 632, 652). Based on that finding, Dr. Alzoobi recommended that Mr. Keating undergo a psychiatric evaluation (R. 652). When Mr. Keating underwent surgery on his right shoulder the very next month, in October 2014, hospital records show that he exhibited symptoms of anxiety, depression and memory loss (R. 598).

No doctor who reviewed the evidence found Mr. Keating's mental impairments to be non-severe. Rather, Dr. Amdur's opinion is supported by Mr. Keating's mental health record that dated back to September 2014 wherein Dr. Alzoobi, the hospital during his shoulder surgery and Dr. Beck all noted or diagnosed Mr. Keating with a depressive disorder. The ALJ could not build a logical bridge to his conclusion that Dr. Amdur's opinions were inconsistent with the medical record without addressing this body of evidence to the contrary.

The ALJ did specifically address Mr. Keating's low score on the MoCA (12 out of 30). He acknowledged that this score indicated a "significant cognitive impairment," but he dismissed it by focusing on Mr. Keating's attention span and comprehension during the exam (R. 26). A MoCA score with normal limits may provide a basis to discount the degree of limitations a claimant asserts. *See Hackeloer v. Berryhill*, No. 15-cv-628-wmc, 2018 WL 1469058 *4 n.5 (W.D.W.I March 26, 2018). But here, it was not acceptable for the ALJ to dismiss Mr. Keating's low MoCA score that showed significant cognitive impairment, and thus supported his claimed limitations, by

focusing on his attention span and comprehension during the exam without considering the other aspects of the test such as concentration, executive function, memory, language, visuoconstructional skills, conceptual thinking, calculations, and orientation.[13] "An ALJ has an obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment (doc. # 11) is granted, and the Commissioner's request for affirmation of the ALJ's decision (doc. # 16) is denied. We remand the case for further proceedings consistent with this opinion. In so doing, we express no view on the outcome of those proceedings or, if Plaintiff is found to be disabled, when that disability commenced.

**ENTER:**

_____
SIDNEY I. SCHENKIER
United States Magistrate Judge

**DATED: August 27, 2018**

---

[13] U.S. Department of Veterans Affairs, https://www.parkinsons.va.gov/consortium/moca.asp (last visited August 23, 2018) (explaining that the MoCA exam is a rapid screening instrument for mild cognitive dysfunction which assesses different cognitive domains: attention and concentration, executive functions, memory, language, visuoconstructional skills, conceptual thinking, calculations, and orientation; the total possible score is 30 points and a score of 26 or above is considered normal).